# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JENNIFER MARY JONES,

                **Plaintiff,**

v.                                                  **Case No:   6:13-cv-520-Orl-22KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the Complaint filed by

Jennifer Mary Jones seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits. Doc.  No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

("SSA").  Doc. Nos. 10, 11.  The parties have also filed their respective memoranda of law.

Doc. Nos. 17, 20.  The matter has been referred to the undersigned for issuance of a Report and

Recommendation.

## PROCEDURAL HISTORY.

      In 2009, Jones applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq.*, and under the Supplemental

Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381 *et seq.*

(sometimes referred to herein as the "Act").   She alleged that her disability began on January 1, 2008.   R. 15, 163.[1]

Jones's applications were denied initially and on reconsideration.   At Jones's request, an Administrative Law Judge ("ALJ") held a hearing.   Jones (accompanied by her attorney) and a vocational expert ("VE") testified at the hearing.   R. 31-98.

After considering the hearing testimony and the evidence of record, the ALJ found that Jones was insured under OASDI through December 31, 2012.   The ALJ found that Jones had not engaged in substantial gainful activity since the alleged disability onset date.   R. 17.

The ALJ found that Jones had osteoarthosis of the knees, bursitis, affective mood disorder, and opioid dependence, which were severe impairments.   These impairments did not meet or equal any listed impairment.   R. 17-18.   The ALJ found that Jones would have mild limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence or pace, with no episodes of decompensation of extended duration.   R. 18.   Despite moderate limitations in concentration, persistence or pace, Jones could understand, remember and carry out short and simple instructions.   *Id.*

The ALJ found that Jones had the residual functional capacity ("RFC") to do the following:

> [P]erform a range of light work . . . .   The claimant is able to lift and/or carry 20 pounds occasionally and ten pounds frequently.   She can sit, stand, and/or walk (with normal breaks) for about six hours each in an eight-hour workday.   The claimant can frequently perform push and/or pull (including operation of hand and/or foot controls) activities for weights as shown for lift and/or carry.   The claimant

---

[1] The SSI application does not appear to be in the record before the Court.

> can occasionally climb ladders, ropes, and/or scaffolds.  She can frequently climb ramps and stairs.  The claimant can frequently kneel and crawl.  She can occasionally perform postural activities such as balance, stoop, and crouch.  The claimant must avoid exposure to hazards, including moving mechanical parts and unprotected heights.  She is able to perform simple, routine, repetitive tasks and can concentrate and persist for periods of two hours in duration throughout the eight-hour workday.  The claimant is limited to a work environment not involving fast paced, high production demands and requiring only occasional changes in the work setting.

R. 19.   In making this assessment, the ALJ gave little weight to the opinions of Marianne McCool, ARNP, because she was not an acceptable source of medical information.   R. 22.   The ALJ gave significant weight to the opinion of Alvan W. Barber, M.D., a consultative examiner, and to the consultative psychological examination report from Hope Counseling Centers.   R. 24.

The ALJ found that Jones could not return to her past relevant work as a mortgage loan processor.   R. 24.   After considering the testimony of the VE, the ALJ concluded that there were light, unskilled jobs available in the national economy that Jones could perform.   R. 25.   Therefore, the ALJ found that Jones was not disabled. *Id.*

Jones asked the Appeals Council to review the ALJ's decision and submitted medical records of Juan C. Castaneda, D.O., reflecting testing and treatment of Jones in 2007 and 2008.   R. 5, 581-87.   On January 23, 2013, the Appeals Council wrote that it had reviewed the new evidence and found that it did not provide a basis for changing the ALJ's decision.   R. 1-2.

Jones seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Jones having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).   A court's review of a final decision of the SSA is limited to determining

- 3 -

whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the ALJ's decision and the parties' memoranda.   Accordingly, I will only summarize facts necessary to address the issues raised in order to protect Jones's privacy to the extent possible.

Jones was born in 1964.   She obtained a GED degree.   R. 40.   She is left-hand dominant. R. 46.   She had previously worked as a mortgage loan processor and junior underwriter.   R. 66.

At the ALJ's hearing, Jones complained of mental limitations, knee pain that interfered with her ability to think and concentrate, and back pain.   R. 84-85, 89.   In written disability reports, she indicated that she had bipolar disorder, depression, arthritis in her knees, bursitis in her shoulder, back problems and carpal tunnel syndrome in both hands.   R. 188, 226, 228, 246.

*Back Impairment*.

The medical records reflect that Jones had a lumbar disc removed in 1998 in an attempt to relieve back pain.   R. 295.

In 2006, Jones reported low back and left leg pain.   R. 303.   An x-ray showed degenerative disk disease at L4-5.   R. 306.   An MRI showed findings consistent with left-sided radiculitis.   R. 309.   She was treated with pain medication, a TENS unit and a fitness program was prescribed.   R. 307.

In February 2008, Jones complained of chronic back pain.   R. 311.   In September 2008, Jones complained of back pain.   Kenneth B. Hawthorne, Jr., M.D., observed tenderness over the

- 4 -

paraspinal muscles and mild spasms.   His assessment was osteoarthritis and degenerative disc disease of the lumbar spine.   R. 357.

Dr. Barber examined Jones on August 11, 2010 at the request of the SSA.   On examination, he observed positive low paravertebral muscle spasms and positive point tenderness in the SI joint.   R. 489.   Jones walked with a slight limp.   R. 490.   Dr. Barber opined that Jones could not walk for long periods of time but she could stand and sit for reasonable periods of time. *Id.*

In January 2011, Jones sought emergency room treatment for radiating low back pain.   An x-ray showed degenerative changes.   She was treated with medication.   R. 534-45.

On March 8, 2011, Jones told Jeffrey T. Newfield, D.O., that she was having low back discomfort.   Upon examination, Dr. Newfield observed multiple tender trigger points.   He treated Jones with steroid injections.   R. 525.

*Knee Impairment*.

Jones sought emergency room treatment in February 2008 due to left knee pain.   An MRI showed a torn meniscus.   R. 311.   Later that month, she had arthroscopic surgery on her knee. R. 358.

In August 2009, Jones sought treatment for right knee pain with difficulty walking.   The diagnosis was synovitis of the right knee joint.   R. 354.

At her examination by Dr. Barber in August 2010, Jones complained of left greater than right knee pain.   R. 486.   In September 2010, Jones sought emergency room treatment for left knee pain.   She was treated with medication.   R. 553-57.

In January 2011, Jones had a strain in the medial collateral ligament of her knee.   R. 527. In May 2011, she reported a burning sensation in her knee.   Dr. Newfield did not observe

effusion, and the knee was not warm in comparison to the other side.   He believed that the problem related to her back.   R. 523.

*Shoulder Impairment.*

Beginning in February 2009, Jones was treated for left shoulder pain.   Dr. Hawthorne observed tenderness in the shoulder on examination.   His assessment was bursitis of the left shoulder.   R. 356.   In May 2009, Dr. Hawthorne observed tenderness in the shoulder and over the paraspinal muscles of the cervical spine with mild pain on range of motion of the neck.   His assessment was neck pain, radiculopathy of the left upper extremity, and bursitis of the shoulder. R. 355.   In October 2009, Jones had injections in the right shoulder to address pain.   R. 370-71.

In October 2010, Jones sought emergency room treatment for bursitis of the right shoulder. She was treated with medication.   R. 547-51.

*Carpal Tunnel Syndrome.*

In February 2008, Jones was treated for numbness and tingling with weakness in her right hand.   Earlier nerve conduction studies showed carpal tunnel syndrome.   The diagnosis of Dr. Castaneda was right carpal tunnel syndrome which was moderate to severe.   R. 581-84.   In March 2009, Jones complained of right hand pain that Daniel R. Monette, M.D., treated with an injection.   R. 405.   In August 2009, Jones again complained to Dr. Monette of bad carpal tunnel pain on the right.   R. 387.

On August 11, 2010, Jones complained to Dr. Barber of pain and numbness in her hands and fingers due to carpal tunnel.   R. 486-87.   Upon examination, Dr. Barber observed 5/5 grip strength in each hand and 5/5 motor strength in both upper extremities.   Phelan's and Tinel's signs, which are indicative of carpal tunnel syndrome, were absent.   R. 489.   Dr. Barber opined that Jones could

push and pull with her upper extremities and use upper body movements and coordinated activities with her hands.  R. 490.

*Mental Impairment.*

Jones admitted that she had abused prescription pain medication due to back pain and depression.  R. 47-48.  Medical records reflect that, in June 2008, Jones was hospitalized due to an apparent drug overdose.  R. 341-42.  She had follow-up treatment with Dr. Monette and ARNP McCool.  R. 387, 427-32.

Jones was treated by ARNP McCool at Behavioral Health of Ormond Beach from May 2008 through May 2011.  R. 427-32, 507-21.  In May 2008, ARNP McCool observed that Jones was anxious and hypomanic with thoughts of suicide.  R. 431-32.  Her diagnostic impression was bipolar disorder, alcohol and opioid abuse.  R. 432.  In September 2008, Jones reported to Dr. Monette that she had seen a psychiatrist and was doing quite well.  R. 418.  On April 27, 2010, ARNP McCool provided a letter summarizing her treatment of Jones on June 11, 2008, and in October 2009 and November 2009.  ARNP McCool indicated that Jones has bipolar disorder and had a problem with opioid abuse due to pain following back surgery.  Side effects of medication and lack of insurance limited the ability to control her mental condition.  She cycled frequently into depression and had frequent anxiety.  Mood instability, depression, pervasive anxiety and short term memory loss made it difficult for her to look for a job or function well enough to hold a job.  ARNP McCool concluded that Jones was severely emotionally disabled.  R. 468.

John R. Parnell, M.D., administered Suboxone treatment to Jones in 2009 and 2010 to try to address her abuse of oxycodone.  R. 464-67.

In February 2010, Felix A. Ortiz, Psy.D., at Hope Counseling Centers examined Jones at the request of the SSA.  It appears that the only medical record Dr. Ortiz reviewed was ARNP

McCool's report dated November 24, 2009 (R. 516).   R. 433-34.   Jones reported that she slept 12 to 14 hours a day and was always exhausted.   She also reported symptoms of depression and anxiety.   R. 435.   Dr. Ortiz observed that Jones's mood was dysphoric and her affect seemed anxious.   Upon testing, her attention and concentration were unremarkable but she had deficits in recent and remote memory and written computation.   R. 435-46.   The diagnostic impression was opioid dependence, major depressive disorder, bipolar disorder and obsessive compulsive disorder, all by history and self-report.   Her prognosis was guarded.   R. 436.

On February 10, 2011, Jones was involuntarily hospitalized due to psychosis.   R. 530-33. On March 28, 2011, ARNP McCool prepared a mental RFC assessment in which she checked boxes indicating that Jones was moderately to markedly limited in several areas of functioning. R. 502-05.   In the remarks and Functional Capacity Assessment portions of the form, she wrote that recently Jones had been manic, depressed and psychotic.   Jones was not stable when ARNP McCool last saw her on March 7, 2011.   Due to side effects of medication, her condition was never stabilized for very long.   ARNP McCool again opined that Jones was severely impaired. R. 504-05.

*Opinions of Reviewing Professionals.*

<u>Physical RFC Assessments</u>.

On August 13, 2010, Nicolas Bancks, M.D., prepared a physical RFC assessment based on review of Jones's records.   Dr. Bancks opined that Jones could lift 20 pounds occasionally and 10 pounds frequently.   She could sit, stand or walk each about 6 hours in an 8-hour day.   She could occasionally climb ladders, ropes and scaffolds, balance, stoop and crouch.   She should avoid concentrated exposure to hazards.   R. 494-501.

<u>Mental RFC Assessments</u>.

On March 18, 2010, Robert F. Schilling, Ph.D., prepared a psychiatric review technique form ("PRTF") based on review of Jones's records.   He concluded that Jones would have mild limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence or pace.   R. 448.   He also prepared a mental RFC assessment in which he checked boxes identifying moderate limitations in concentration and persistence, including in the ability to complete a normal workday and workweek.   R. 452-53.   In Section III, the Functional Capacity Assessment portion of the form, Dr. Schilling wrote that Jones "retains the ability to perform simple, repetitive tasks and likely has abilities to perform tasks at higher levels in spite of the moderate limitations noted above.   [She] is able to meet the basic mental demands of work on a sustained basis despite any [medically determinable impairments]."   R. 454.

On July 27, 2010, James A. Brown, Ph.D., prepared a PRTF after review of Jones's records.   Dr. Brown opined that Jones would have only mild limitations in activities of daily living, social functioning and concentration, persistence or pace.   R. 482.

### The ALJ's Hearing.

At the ALJ's hearing, Jones used a cane that had been prescribed years earlier.   R. 59. She used it occasionally to avoid putting too much pressure on her knees.   R. 60-61.   She was able to walk her dogs for about 5 minutes each, twice a day. R. 71-72.   She estimated that she could lift up to 10 pounds.   R. 79.   She could stand 15 or 20 minutes but needed to move about due to back pain.   R. 80.   She could sit for about 30 minutes but not in the same position.   R. 248.

During a typical day, Jones would watch television, shop at stores and visit with a friend. R. 78.   Jones had a driver's license, and she drove two or three times a week.   R. 41-42.   In March 2011, she rode with a friend on a drive to New York.   R. 42-43.   She also flew to

Connecticut in 2009 but returned early because she had a "melt down" due to bad depression. R. 44-45.

The ALJ asked the VE to assume a hypothetical person of Jones's age, education and past work experience with the limitations stated in the RFC assessment.   R. 93-94.   The VE testified that this hypothetical person could perform the light, unskilled jobs of marker, order caller, and ticket taker.   R. 94-95.   If the hypothetical person could not perform work for 8 hours a day, 40 hours a week, or if the person had a substantial loss in the ability to perform at least one of the basic mental demands for unskilled work, the VE testified that there would be no work the person could perform.   R. 95.

## ANALYSIS.

Jones asserts that the ALJ erred by failing to credit the opinions of Dr. Schilling and ARNP McCool that she could not complete a normal workday and workweek due to psychologically based symptoms.   She also argues that the Appeals Council erred by failing to find the new evidence presented to be material and by failing to articulate the basis for that decision.   These are the only issues I will address.[2]

### *Mental Functional Capacity.*

Dr. Schilling, a reviewing physician, checked a box on the mental RFC assessment form reflecting that Jones would have moderate limitations in the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."   R. 453.

---

[2] The parties were advised in the Scheduling Order that issues not specifically raised may be waived. Doc. No. 13 at 2.

ARNP McCool, a treating professional, checked a box on the mental RFC assessment form reflecting that Jones would be markedly limited in this area of function.   R. 503.   Jones contends that the ALJ erred by failing to discuss Dr. Schilling's opinion and by giving little weight to ARNP McCool's opinion because she was not an acceptable medical source.

The argument that the boxes checked on the mental RFC form are functional capacity assessments fails.   The boxes checked by Dr. Schilling and ARNP McCool indicate areas in which Jones's functional capacity is impaired, but they do not indicate the degree and extent of the limitation.   After checking the boxes as an "aid," the professional completing the form is then required to detail his actual RFC assessment in Section III of the form, entitled "Functional Capacity Assessment."   *Land v. Comm'r of Soc. Sec.*, 494 F. App'x 47, 49 (11th Cir. 2012).[3]

Dr. Schilling stated his assessment of Jones's mental functional ability in Section III of his form, as follows:

> Claimant retains the ability to perform simple, repetitive tasks and likely has abilities to perform tasks at higher levels in spite of the moderate limitations noted above.   Claimant is able to meet the basic mental demands of work on a sustained basis despite any limitations resulting from identified [medically determinable impairments].

R. 454.   Dr. Schilling's opinion, therefore, does not support Jones's argument that she cannot work 8 hours a day, 5 days a week.   Further, the ALJ incorporated the limitation to work involving simple, repetitive tasks in the RFC assessment.   Under these circumstances, the failure to state the weight given to Dr. Schilling's opinion is harmless error.

---

[3] Unpublished decisions of the United States Court of Appeals for the Eleventh Circuit are cited herein as persuasive authority.

Jones correctly argues that ARNP McCool opined that Jones could not function well enough to look for a job or hold a job.   While this opinion was not directly tied to the box checked on the form, it is some indication that ARNP McCool did not believe Jones could work 8 hours a day, 5 days a week, no matter the simple or repetitive nature of the job.   Jones also correctly argues that the SSA instructs its adjudicators that opinions from "other sources" who have "special knowledge of the individual . . . may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."   SSR 06-03p, 2006 WL 2329939, at * 2 (2006).   ARNP McCool is an "other source" who has special insight into Jones's functional abilities from her treatment of Jones.

Nevertheless, the SSA only requires an adjudicator to "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."   *Id.* at * 6.   The ALJ complied with this requirement by stating that he gave little weight to ARNP McCool's decision.   The ALJ further explained that he gave significant weight to the opinion of Dr. Ortiz, because he was an examining source, his opinion was well supported by the record as a whole, and his opinion was not contradicted by any other objective medical evidence.   R. 24.   In her memorandum, Jones does not challenge the Commissioner's reliance on Dr. Ortiz's opinion.

The ALJ complied with the law in his assessment of ARNP McCool's opinions.   He stated the weight given to ARNP McCool's opinions, as required by Rule 06-3p, and further explained why he gave significant weight to the opinion of an examining psychiatrist.   This is all that is required in evaluating the opinion of an "other source."

For these reasons, I recommend that the Court find that Jones's first assignment of error is not well taken.

*Evidence Presented to the Appeals Council.*

Jones contends that the medical records of Dr. Castaneda and the supporting results of nerve conduction studies performed in 2007 are material because the ALJ failed to consider whether Jones's carpal tunnel syndrome was a severe impairment.   The Commissioner correctly argues that the failure to consider whether carpal tunnel syndrome was a severe impairment at step two of the sequential evaluation is harmless because the ALJ found other severe impairments and continued the evaluation through subsequent steps of the evaluation process.   *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010).

The ALJ also considered limitations on use of Jones's hands in later stages of the sequential evaluation.   He gave significant weight to the opinion of Dr. Barber, who considered Jones's complaint of pain and numbness in her hands due to carpal tunnel syndrome.   As the ALJ wrote in the decision, Dr. Barber found on testing that Jones had full grip strength in each hand. Phelan's and Tinel's signs, which are indicative of carpal tunnel syndrome, were absent.   These findings supported Dr. Barber's conclusion, which the ALJ adopted, that Jones could push and pull with her upper extremities and use upper body movements and coordinated activities with her hands.   Notably, Jones does not contend that reliance on Dr. Barber's opinion was erroneous.

Jones also contends that the Appeals Council erred by failing to explain why it did not consider the new evidence sufficient to provide a basis to change the ALJ's decision.   The Eleventh Circuit has held, albeit in unpublished decisions, that nothing requires the Appeals Council to further explain its denial of review beyond a statement that it considered the additional evidence and found that it did not provide a basis for changing the ALJ's decision.   *See Levie v.*

*Comm'r of Soc. Sec.*, 514 F. App'x 829, 832-33 (11th Cir. 2013) (citing *Ingram v. Comm'r of Soc. Sec.*, 496 F.2d 1253, 1262 (11th Cir. 2007)).   This analysis appears correct in light of the requirement in *Ingram* that this Court consider the evidence as a whole, including evidence first submitted to the Appeals Council, to determine whether the final decision of the Commissioner is supported by substantial evidence and correct application of the law.   *Ingram*, 496 F.3d at 1262. The reason the Appeals Council found the evidence insufficient to warrant changing an ALJ's decision would not materially assist this Court in its analysis of the record as a whole.

For these reasons, I recommend that the Court find that Jones's second assignment of error is also not well taken.

## RECOMMENDATION.

For the reasons set forth above, I **RESPECTFULY RECOMMEND** that the Court **AFFIRM** the final decision of the Commissioner.   I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its ruling on this Report and Recommendation and, thereafter, close the file.

Failure to file written objections to the proposed findings and recommendations contained

in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

       Recommended in Orlando, Florida on June 3, 2014.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Courtroom Deputy Clerk
Counsel of Record